UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

  v.

**CARLOS JOVEL,**

    **Defendant.**

:

:

**Case No. 2:25-cr-63**
**Chief Judge Sarah D. Morrison**

## OPINION AND ORDER

In October 2024, Ohio State Highway Patrol Trooper Timothy Ehrenborg pulled over Defendant Carlos Jovel to conduct an administrative inspection of Jovel's semi-truck. During the inspection, Trooper Ehrenborg began to suspect that Jovel was smuggling illegal drugs. A K9 was called to the scene to conduct a sniff around the truck. After the K9 positively indicated to the presence of drugs, 15 kilogram-size packages of cocaine were discovered inside the truck.

Jovel filed a Motion to Suppress Search of Automobile and Request for an Evidentiary Hearing. (Mot., ECF No. 31.) The Government responded (Resp., ECF No. 36) and Jovel replied (Reply, ECF No. 41). An evidentiary hearing was held on January 16, 2025. For the reasons below, the Motion is **DENIED**.

**I. FACTUAL BACKGROUND**[1]

On October 11, 2024, Trooper Ehrenborg observed a white commercial tractor trailer bearing USDOT No. 2941872 on Interstate 70 near mile marker 74 in

---

[1] The following factual background is based on Trooper Ehrenborg's testimony, his report, and his body camera footage. The body camera footage was

Madison County, Ohio. (Ehrenborg Rep., ECF No. 31-1, PAGEID# 94.) He ran the truck's USDOT number through SafeSpect[2] and identified the carrier as Black Falcon Trucking, LLC. (Ehrenborg Rep., PAGEID# 94.) According to SafeSpect, Falcon Trucking had an inspection value of 72 (an optional inspection score), its United Carrier Registration ("UCR") was unpaid, and it did not have an International Fuel Tax Agreement ("IFTA") on file. (*Id.*) Trooper Ehrenborg initiated a traffic stop to conduct an administrative inspection. (*Id.*)

Trooper Ehrenborg approached and contacted the driver (who was later identified as Jovel) and told him why he was stopped. (Tpr.'s Body Cam, 10:30:45.) Jovel told Trooper Ehrenborg that he owned the truck and trailer and was hauling general freight. (*Id.*, 10:30:59.) Trooper Ehrenborg asked Jovel for his bill of lading and logbook. Jovel provided two bills of lading, one that was signed for and one that was not. (*Id.*, 10:32:09.) As for the logbook, Trooper Ehrenborg asked Jovel if he was using electronic logs (as required) and Jovel said that he was using paper. (*Id.*, 10:31:31.) Trooper Ehrenborg asked him why, and Jovel said that he used paper logs because he was waiting for "the company" to provide him with the proper equipment for electronic logs, but he acknowledged that his truck was the only one

---

both manually filed by Jovel as Defendant's Exhibit C and introduced into evidence by the Government as Government's Exhibit 5. The body camera footage is hereinafter referred to as Tpr.'s Body Cam. All citations are an approximate reference to the starting time (listed in the top right-hand corner) for the relevant portion of the footage cited.

[2] SafeSpect is designed by the Federal Motor Carrier Safety Administration ("FMCSA") and "collects data related to the inspection of a commercial motor vehicle, the motor carrier and its driver." (Resp., PAGEID# 109, n. 1.)

in Falcon Trucking's fleet. (*Id.*, 10:33:21.) Before handing over his paper logbook, Jovel said that he started his day in St. Louis, Missouri, but had not yet put that information into his logbook. (*Id.*, 10:32:53.)

After Trooper Ehrenborg returned to his cruiser, he was joined by Sgt. Williamson. (*Id.*, 10:36:44.) The two of them reviewed Jovel's paperwork and observed several entries in his paper logbook that struck them as unusual for the trucking industry. (*Id.*, 10:37:03; Ehrenborg Rep., PAGEID# 94.) For example, Jovel was off duty from October 1–6, he picked up the loads he was hauling on October 7, and then he went back home and off duty for 18 hours. (Tpr. Body Cam, 10:37:25.) Sgt. Williamson went to discuss the unusual entries with Jovel. (*Id.*, 10:39:05.) When Sgt. Williamson returned to the cruiser, he shared with Trooper Ehrenborg that Jovel's logs were "no good." (*Id.*, 10:44:57.)

Trooper Ehrenborg then checked Jovel's criminal history in NADDIS[3] and saw that Jovel had multiple interactions with phone numbers associated with ongoing DEA investigations.[4] He also learned that Jovel had a 2009 arrest for "65 kilos." (*Id.*, 10:53:20, 10:54:29.) With this information, Trooper Ehrenborg approached the truck and asked Jovel to exit. (*Id.*, 10:55:49.) Trooper Ehrenborg

---

[3] The "Narcotics and Dangerous Drugs Information System (NADDIS) … is a centralized electronic data index system" that provides a "worldwide, comprehensive search because all DEA intelligence and investigative records are indexed into NADDIS." *Anand v. U.S. Dept. of Health and Human Servs.*, No. 21-1635, 2023 WL 2645649 (D.D.C. Mar. 27, 2023).

[4] Trooper Ehrenborg testified that Jovel's interactions with phone numbers associated with ongoing DEA investigations are referred to as "tolls." (Hr'g. Tr., 60:19–22.) All citations to "Hr'g. Tr." are to the "rough" transcript prepared for the Court's use in rendering this Opinion and Order.

3

explained to Jovel that he had found violations, and that Jovel would be cited for an incomplete paper logbook and for not having electronic logs. (*Id.*, 10:56:44.) Trooper Ehrenborg then asked Jovel for consent to search the truck. (*Id.*, 10:58:08.) Jovel initially responded, "if that's what you guys want to do," but then said that he did not consent to a search. (*Id.*) After Jovel refused a search, Trooper Ehrenborg returned to his cruiser to finish his inspection; at that time, Trooper Ehrenborg requested a K9 unit to the scene. (*Id.*, 11:00:09.)

London K9 Officer Michael Combs and K9 Cento arrived a short time later. Cento was deployed around the truck and alerted to the presence of illegal drugs. (Ehrenborg Rep., PAGEID# 95.) Troopers then searched the truck and found 15 kilogram-size packages of what was later identified as cocaine. (*Id.*) Jovel was arrested on the scene. (*Id.*)

## II.  ANALYSIS

Jovel argues that Trooper Ehrenborg unlawfully deviated from the initial purpose of the stop, without reasonable suspicion, to provide time for a K9 to arrive on scene.[5] He argues the Court should suppress all evidence recovered in the search. (Mot., PAGEID # 72.)

The Fourth Amendment protects the "right of the people to be secure ... against unreasonable searches and seizures[.]" U.S. CONST. amend. IV. "A lawful roadside stop begins when a vehicle is pulled over for investigation of a

---

[5] Jovel initially contested the traffic stop itself but conceded at the evidentiary hearing that Trooper Ehrenborg lawfully conducted a traffic stop to perform a Level III administrative inspection. (Hr'g. Tr., 118:3–5.)

4

traffic violation." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). "Because addressing the infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate th[at] purpose.'" *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (citing *United States v. Sharpe*, 470 U.S. 675, 684 (1985)). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* "To prolong a traffic stop beyond its original 'mission,' police must have reasonable suspicion of additional wrongdoing." *United States v. Jordan*, 100 F.4th 714, 718 (6th Cir. 2024).

The parties agree that Trooper Ehrenborg deviated from his administrative inspection when he input Jovel's information into his DEA issued laptop to conduct a criminal background check. (Hr'g. Tr., 55:15–18.) Accordingly, the analysis turns on whether Trooper Ehrenborg had reasonable suspicion to suspect that Jovel was involved in illegal drug smuggling when he deviated from his administrative inspection. Jovel says no. The Government says he did, and the Court agrees. As a result, the Court does not address the Government's alternative argument that the inevitable discovery doctrine applies.

### Trooper Ehrenborg had reasonable articulable suspicion to believe Jovel was involved in illegal drug smuggling.

Once Trooper Ehrenborg abandoned his "traffic-related investigation, an independent reasonable suspicion of unlawful activity beyond the traffic violation was required to lawfully continue the stop." *United States v. Whitley*, 34 F.4th 522, 532 (6th Cir. 2022). "Reasonable suspicion sets a modest bar." *United States v. Urraca*, 123 F.4th 834, 836 (6th Cir. 2024). It is "more than just a hunch but

5

obviously less than probable cause." *Id.* at 837 (cleaned up). "It is a 'commonsense' standard based on 'the factual and practical considerations of everyday life.'" *Id.*

Officers are permitted to "draw on their own experiences and specialized training to make inferences from and deductions about the cumulative information available." *United States v. Arvizu*, 534 U.S. 266, 266 (2002). An officer does not have to "rule out innocuous explanations for suspicious behavior in order for his suspicion to be 'reasonable.'" *Jordan*, 100 F.4th at 719. Officers may also rely on "criminal 'profiles,'" or common "'modes or patterns of operation'" that lead them to "be reasonably suspicious of individuals whose behavior fits those patterns." *Id.* It is not always the case that one fact in isolation equals reasonable suspicion. Instead, a reviewing court "must assess whether everything the officer observed, taken together and in context, is objectively suspicious." *Id.*

Based on the totality of the circumstances, Trooper Ehrenborg had reasonable suspicion to deviate from his administrative inspection to investigate Jovel for illegal drug smuggling. To start, Trooper Ehrenborg had received a tip from a DEA agent approximately eight months before the stop that Falcon Trucking might be involved in drug smuggling. (Hr'g. Tr., 14:2–21.) The tip included information that the trailer was registered in a woman's name, which Trooper Ehrenborg said he rarely sees. (*Id.*, 14:16–19.) Trooper Ehrenborg printed Falcon Trucking's company profile and put it in the visor of his cruiser. (*Id.*, 82:10–16.) The most recent printout, dated September 30, 2024, was in Trooper Ehrenborg's visor on the day of the stop. (*Id.*; *see* Govt's Ex. 6.) With the tip in mind, Trooper

6

Ehrenborg ran the truck's USDOT number and confirmed it belonged to Falcon Trucking and then ran the trailer's registration and saw that it was registered to a woman. (*Id.*, 14:22–23, 26:8–13.)

His administrative inspection added to his suspicion. When Trooper Ehrenborg approached the truck and asked Jovel what he was hauling, Jovel provided a vague response: "they say general freight." Trooper Ehrenborg then asked for Jovel's bill of lading and logbook, but Jovel was not using electronic logs as required; when asked why not, Jovel said that he was waiting for "the company" to give it to him, even though his truck is the only one in Falcon Trucking's fleet. And Jovel's paper logbook had no information for the day of the inspection. As for the bills of lading, Jovel provided one that was signed and one that was not, and neither jogged his memory as to what he was hauling.

After Trooper Ehrenborg and Sgt. Williamson reviewed the paper logbook and discussed the entries (or lack thereof), Sgt. Williamson asked Jovel more questions about the logbook. Both troopers still thought it was unusual that Jovel took a week off for his birthday, went and picked up both of his current loads, and then returned home and went off-duty for 18 hours. Jovel's log entries added to Trooper Ehrenborg's suspicion because for truckers, time is money, and taking time off after picking up a load is abnormal. (Hr'g. Tr., 59:14–23.) And the paper logbook was suspicious based on Trooper Ehrenborg's training and experience because not having electronic logs means that a truck driver can drive wherever they want. (Hr'g. Tr., 37:17.) It was at this point in the stop—based on the tip, Jovel's logbook,

7

and both troopers' interactions with Jovel—that Trooper Ehrenborg believed he had reasonable suspicion of additional wrongdoing by Jovel.

Jovel raises several counterarguments. First, he argues that the tip tainted Trooper Ehrenborg's observations. (Reply, PAGEID# 137.) But Trooper Ehrenborg was allowed to consider the tip during his interactions with Jovel. He has 26 years of experience with the Ohio State Highway Patrol, with at least six years assigned as a task force officer with the DEA and received specialized training in drug interdiction. (Hr'g. Tr., 4:25, 6:1, 61:13–17.) So when Trooper Ehrenborg encountered the subject of a tip he received from another law enforcement officer with the DEA, he was permitted to use his "own experience and specialized training to make inferences from and deductions about the cumulative information" he learned during the stop. *See Arvizu*, 534 U.S. at 273. The tip was one piece of information; taken together with Trooper Ehrenborg's observations, Jovel's conduct was objectively suspicious. *See, e.g.*, *Jordan*, 100 F.4th at 719 ("[C]ourts must assess whether everything the officer observed, taken together and in context, is objectively suspicious.").

Jovel next argues that his unusual hours off, failure to have electronic logs, and incomplete paper logbook do not create reasonable suspicion. (Reply, PAGEID# 137.) He claims he has innocent explanations for his unusual hours: he was off for his birthday and visiting a mechanic. (Mot., PAGEID# 83.) As for his failure to use electronic logs or fill out his paper logbook, Jovel implies he was waiting on a third-party to provide the electronic logs and waiting to fill out the logbook at the end of

8

his day. (Hr'g. Tr., 90:21–23, 88:25–89:3.) But "an officer doesn't need to rule out innocuous explanations for suspicious behavior in order for his suspicion to be 'reasonable.'" *Jordan*, 100 F.4th at 719.

Jovel's divide-and-conquer approach of attacking each observation one-by-one ignores that reasonable suspicion is a totality of the circumstances analysis. *See Arvizu*, 534 U.S. at 267 ("[A court's] evaluation and rejection of certain factors in isolation from each other does not take into account the 'totality of the circumstances,' as this Court's cases have understood that phrase."). Here, Trooper Ehrenborg relied on his training and experience and analyzed all the information (including the tip, Jovel's logbook violations, and unusual hours) to determine that the evidence was consistent with the characteristics of a truck driver involved in drug smuggling.

The Court finds that Trooper Ehrenborg had reasonable suspicion that Jovel was involved in drug smuggling when he deviated from his administrative inspection.

### III. CONCLUSION

The Motion to Suppress Search of Automobile (ECF No. 31) is **DENIED**.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

9